MICHAEL ROMANO (SBN 232182)
SUSAN CHAMPION (SBN 295598)
Email: schampion@law.stanford.edu
STANFORD LAW SCHOOL
559 Nathan Abbott Way
Stanford, CA 94305
Phone No. (650) 736-7757
Fax No. (650) 723-8230

NICK BRUSTIN, *pro hac vice pending*
AMELIA GREEN, *pro hac vice pending*
RHIANNA REY, *pro hac vice pending*
ANNIE SLOAN, *pro hac vice pending*
Email: amelia@nsbhf.com
NEUFELD SCHECK BRUSTIN HOFFMANN & FREUDENBERGER, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
Phone No. (212) 965-9081
Fax No. (212) 965-9084

MICHAEL G. FREEDMAN (SBN 281279)
ASHWINI MATE (SBN 268046)
Email: michael@thefreedmanfirm.com
THE FREEDMAN FIRM PC
1801 Century Park East, Suite 450
Los Angeles, CA 90067
Phone No. (310) 285-2210

*Attorneys for Plaintiff Daniel Saldaña*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Daniel Saldaña, | ) |
| | ) |
| Plaintiff, | ) Case No. |
| | ) |
| | ) |
| | ) |
| v. | ) **COMPLAINT AND** |
| | ) **DEMAND FOR JURY** |
| | ) **TRIAL** |
| | ) |

Baldwin Park Police Department Officers )
Michael Donovan and Leonard Maughan; Los )
Angeles County Assistant District Attorney )
Steven Sowders; California Department of )
Corrections and Rehabilitation's Board of )
Parole Hearings Commissioners Brian Roberts )
and Keith Stanton; Los Angeles County; and )
John and Jane Does; )
)
        Defendants. )
_____ )

Plaintiff Daniel Saldaña, by and through his attorneys, alleges as follows:

## **INTRODUCTION**

1.    Plaintiff Daniel Saldaña spent more than 33 years wrongly imprisoned for a crime that he did not commit: a 1989 shooting at a carful of teenagers in Baldwin Park, California. In 2023, Saldaña was exonerated after a thorough reinvestigation by the Conviction Integrity Unit of the Los Angeles County District Attorney's Office ("LADA CIU") determined that he was actually innocent.

2.    Saldaña had nothing to do with the 1989 shooting, which was actually committed by Raul Vidal and Dino Velasquez, aided by Vidal's girlfriend, April Gallegos. But Defendant Baldwin Park Police Department ("BPPD") detectives relied solely on coerced and fabricated evidence to connect Saldaña to the incident. And to push their flimsy case against Saldaña forward, Defendant lead detective Michael Donovan conducted a series of suggestive photo identification procedures

with the teenage victims to obtain false eyewitness identification evidence implicating him.

3.    Defendant detectives hid their misconduct and in 1990 Saldaña was wrongfully convicted. Ultimately the testimony secured by suggestive eyewitness identification procedures was the only evidence implicating Saldaña at his criminal trial.

4.    Saldaña was tried alongside two of the three true perpetrators, Vidal and Gallegos. Vidal and Gallegos were both convicted at trial. The true third perpetrator, Velasquez, was never investigated or arrested.

5.    Saldaña steadfastly asserted his innocence over three decades of wrongful imprisonment. In June 2017, Saldaña appeared before the California Department of Corrections and Rehabilitation's Board of Parole Hearings ("CDCR's BPH") for the first time, and again asserted his actual innocence. But Saldaña's application for release on parole was denied, including on the ground that his assertion of innocence was inconsistent with the remorse and insight necessary to justify release.

6.    Only two months later, BPH Commissioner Defendants Brian Roberts and Keith Stanton, and Los Angeles County Assistant District Attorney Defendant Steven Sowders learned of new evidence confirming Saldaña's assertion of actual innocence: during a separate parole hearing for one of Saldaña's co-defendants,

Raul Vidal testified that Saldaña was actually innocent and gave the name of the true third perpetrator as Dino Velasquez. At the hearing, Defendants recognized Vidal's sworn confession and proclamation of Saldaña's innocence was important evidence that had to be shared with Saldaña immediately. Indeed, Defendants Roberts and Stanton credited the reliability of Vidal's admissions in granting Vidal parole.

7.     However, this exculpatory evidence regarding Saldaña's innocence was completely buried and hidden from Saldaña *for another six years* while he remained wrongly incarcerated. Indeed, neither the BPH nor the District Attorney's Office disclosed this information to Saldaña in 2022 when he again sought parole, again asserted his innocence and again had his application denied.

8.     In February 2023, the exculpatory evidence regarding Saldaña's innocence and the name of the true perpetrator, Dino Velasquez, was finally disclosed to the current LADA CIU. The CIU immediately conducted a thorough reinvestigation that decisively concluded "Saldaña had no role [in this] crime."

9.     On May 11, 2023, the CIU jointly moved with Stanford Law School's Three Strikes Project to vacate Saldaña's conviction on the basis of his factual innocence. Finally, on May 11, 2023—within four months of the disclosure of the exculpatory evidence—the Los Angeles County Superior Court of California vacated the conviction, found Saldaña actually innocent and ordered him released.

10.   Daniel Saldaña—now exonerated and free at 56 years old—brings this lawsuit to hold accountable those who illegally caused his wrongful conviction and continued wrongful detention.

### JURISDICTION AND VENUE

11.   This action is brought by Daniel Saldaña pursuant to 42 U.S.C. §1983.

12.   Jurisdiction is premised on 28 U.S.C. §§ 1331 and 1343(a)(1) – (a)(4).

13.   Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events, injuries and violations of rights alleged herein occurred within the City of Baldwin Park, California, within this district, and because the Defendants, or some of them, reside within the jurisdictional boundaries of this Court.

14.   Saldaña has complied with the requirements of Cal. Gov't Code § 900 et seq. and served Defendants with Notices of Claim on November 2, 2023. The City of Baldwin Park rejected the claim on November 7, 2023. Los Angeles County rejected the claim on November 20, 2023, and December 22, 2023. The CDCR rejected the claim on December 21, 2023.

### PARTIES

15.   **Plaintiff Daniel Saldaña** currently lives in West Covina, California and was wrongfully incarcerated from the time of his wrongful arrest in January 1990 until his release in May 2023.

16.    At all relevant times, **Defendant Michael Donovan** was employed by the BPPD as a detective and law enforcement official, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Baldwin Park and State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

17.    At all relevant times, **Defendant Leonard Maughan** was employed by the BPPD as a detective and law enforcement official, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Baldwin Park and State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

18.    At all relevant times, **Defendant Brian Roberts** was employed by the CDCR's BPH as a commissioner, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

19.    At all relevant times, **Defendant Keith Stanton** was employed by the CDCR's BPH as a commissioner, acting under color of law and in his individual

capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

20. At all relevant times, **Defendant Steven Sowders** was employed by the Los Angeles County District Attorney's Office, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Los Angeles County and the State of California. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

21. At all relevant times, **Defendants John and Jane Does** were employed by the CDCR's BPH or the Los Angeles County District Attorney's Office, acting under color of law and within the scope of his or her employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Los Angeles County and/or the State of California. They are sued in their individual capacities.

22. Defendant **Los Angeles County** is, and at all times herein alleged was, a public entity organized and existing under the laws of the State of California. The Los Angeles County District Attorney's Office is, and at all times herein alleged was, an agency of Los Angeles County.

## FACTS

**Raul Vidal, Dino Velasquez, and April Gallegos shoot at a car of six teenagers in Baldwin Park.**

23.    At approximately 10:30 pm on Friday, October 27, 1989, East Side Bolen gang members Raul Vidal and Dino Velasquez had a confrontation on the street in Baldwin Park, California, that ended with them shooting at a carful of high schoolers.

24.    While Vidal's girlfriend and fellow East Side Bolen gang member April Gallegos was driving Vidal and Velasquez around Baldwin Park in a blue Datsun B210, they encountered a Chevrolet Monte Carlo carrying six teenage high school friends.

25.    Vidal, the front passenger of the blue Datsun B210, stepped out of the car and repeatedly challenged the occupants of the Monte Carlo about where they were from. Unsatisfied with their response, Vidal instructed the Datsun's rear passenger, Velasquez, to "pull out the cuete"—slang for gun.

26.    Upon hearing that threat, the driver of the Monte Carlo, Esteban Rodriguez, started to drive away. Simultaneously, Velasquez exited the rear of the Datsun. Vidal and Velasquez immediately fired multiple shots at the six teens in the Monte Carlo. Two of the teens were injured: driver Rodriguez was struck in the

shoulder and front passenger Jesus Zamudio in the thigh. Shortly thereafter the

Monte Carlo crashed into a tree.

27.    Immediately after the shooting Gallegos drove off in the Datsun while

Vidal and Velasquez fled on foot.

**Saldaña is actually innocent.**

28.    Daniel Saldaña was not present for and had nothing to do with the

October 27, 1989, Baldwin Park shooting. He is completely innocent.

29.    In October 1989, Saldaña was 22 years old and living with his parents

and younger siblings in the same Baldwin Park neighborhood where he was raised

and grew up. Like the many other youth in his community, Saldaña had joined the

local East Side Bolen gang as a teenager. Despite his innocence, and although no

reliable evidence implicated Saldaña in the 1989 shooting, the BPPD Defendants

wrongly targeted Saldaña because of his connection to the gang.

30.    On the night of the shooting, Saldaña was with his girlfriend Theresa

Garcia. They spent the entire evening together—first at Garcia's family home and

then attending a party.

31.    Consistent with his innocence, no physical or forensic evidence ever

implicated Saldaña. Since his 1990 arrest, Saldaña has steadfastly maintained his

innocence throughout his over 33 years of wrongful incarceration, including during

multiple parole hearings, and then later when questioned by CIU investigators and in secretly taped conversations with an undercover agent.

32.    Two of the true perpetrators of the crime—Vidal and Gallegos—have confessed to their involvement and reported to law enforcement authorities that Saldaña is innocent, and that the true shooter is Dino Velasquez. In 2017, Vidal testified to Saldaña's innocence under oath before the parole board. In 2023, Gallegos similarly asserted Saldaña's innocence in secretly taped conversations with an undercover police agent and when interviewed by CIU investigators.

33.    In 2023, the LADA CIU conducted a thorough reinvestigation of Saldaña's case and determined that Saldaña is actually innocent. On May 11, 2023, Saldaña's conviction was finally vacated and the charges against him were dismissed. On that same day, the Honorable William C. Ryan of the Los Angeles County Superior Court of California, entered an order declaring Saldaña "factually innocent of all charges and offenses of which he was previously convicted."

**The Baldwin Park Police Department responds to the shooting and arrests one of the actual perpetrators, Gallegos, who was fleeing the scene.**

34.    BPPD officers were in the area and arrived at the scene of the October 27, 1989, shooting within seconds.

35.    Shortly after the shooting, a BPPD officer observed Gallegos walking away from the blue Datsun B210, which she had driven into a nearby alley. Gallegos was arrested and brought to the BPPD station.

36.    The two injured victims—Rodriguez and Zamudio—were brought to the hospital for medical care, while the other four passengers were taken to the BPPD station for interviews.

37.    During initial interviews at the hospital, both Rodriguez and Zamudio told BPPD officers they believed they would be able to identify the male perpetrator who had first stepped out of the blue Datsun and spoken to them (now known to be Vidal), but were unsure of the second male perpetrator (now known to be Velasquez).

**After initial interviews of the teenage victims and true perpetrator Gallegos, the BPPD's investigation is going nowhere.**

38.    On the same night of the shooting, Defendant Michael Donovan of the BPPD gang unit was assigned as lead detective to investigate the shooting and reported to the BPPD station. In subsequent days of the investigation, Donovan was assisted in his investigation by other BPPD detectives, including fellow gang detective Defendant Leonard Maughan.

39.    At the station, Defendant Donovan individually interviewed the four uninjured victims: Angel Ontiveros, Angel Hernandez, and brothers Manuel and Rueben Urquidez. Defendant Donovan did not tape record any of these interviews.

40.    All four of the uninjured victims gave reports consistent with what Rodriguez and Zamudio had already told police at the hospital: that they believed they could identify the first person who stepped out of the blue Datsun and who spoke to them at the scene (now known to be Vidal) but that they could not identify the second person out of the Datsun (now known to be Velasquez). Hernandez reported he had seen the first person before in the area and believed him to be a member of the East Side Bolen gang but could not identify him by name.

41.    During the early morning hours of October 28, 1989, Defendant Donovan also interviewed Gallegos, who had been arrested near the scene. Although Gallegos admitted she had been driving the blue Datsun B210 and was a member of the East Side Bolen gang, she unconvincingly denied any knowledge about the shooting the night before. Gallegos provided an alibi by claiming that at the time of her arrest she was heading to visit a relative of her son. Lacking a confession from Gallegos or other evidence sufficient to charge Gallegos with the shooting, Donovan had to release Gallegos from custody.

42.     However, Donovan subsequently confirmed through investigation that the alibi Gallegos had provided was false. Donovan also took photos of Gallegos's blue Datsun B210, which both injured victims (driver Rodriguez and front-passenger Zamudio) identified as the car involved in the shooting. Nevertheless, when Donovan arranged to pick Gallegos up and question her again, Gallegos continued to falsely deny any knowledge about or involvement in the crime.

**After over two months of no leads, Defendants use coercion and suggestion with Gallegos to fabricate evidence implicating Saldaña.**

43.     Over the next two months, Donovan received information that Gallegos's boyfriend, Raul Vidal, who went by the moniker "Lil Chato," may have been involved in the shooting. Vidal was at that time on parole for armed robbery, and so Donovan arranged a parole search of Vidal's home.

44.     On December 20, 1989, Defendant Donovan, along with Defendant Maughan and Vidal's parole officer, went to Vidal's home. When they arrived, they found Vidal together with Gallegos, who was in Vidal's bed.

45.     Defendants Donovan and Maughan pulled Gallegos into a bedroom alone where they yelled and swore at her, threatening that she would never see her three-year-old son again if she did not give them the information they wanted. Donovan and Maughan then brought Gallegos to the station for further questioning.

46.    Vidal, who had falsely denied any involvement in the shooting, was left at his residence.

47.    Once at the BPPD station, Defendants Donovan and Maughan interrogated Gallegos. They yelled at Gallegos again and threatened police would take away her son and harass her family unless she gave them the information they wanted.

48.    Gallegos, who was a 22-year-old single mother with a limited criminal history, began to feel afraid and started to cry under the pressure.

49.    During the interrogation, Defendants showed Gallegos folders of loose photos they had gathered of local gang members, including the East Side Bolen gang, and demanded, through threats and coercion, that Gallegos identify two of them as the people responsible for the shooting incident.

50.    In addition to threatening and pressuring Gallegos, Donovan and Maughan also fed Gallegos information and told her what to say.

51.    After telling Gallegos what to say, who to point out and who to blame for the shooting, Donovan videotaped the manufactured and coerced statements of Gallegos, which were later played during a pre-trial hearing.

52.    Defendants later misrepresented to prosecutors that during this interrogation Gallegos willingly and of her own accord, absent any threats or inducements, "change[d] her story" after viewing photos of East Side Bolen gang

members. Rather, Gallegos had acquiesced to Defendants' pressure and control and falsely implicated two of the people in the photos in the shooting: "Angel" (Saldaña) and "Goofy" (Robert Gaytan). Prosecutors relied on these misrepresentations in initiating the case against Saldaña and bringing him to trial.

53.     Neither "Angel" (Saldaña) nor "Goofy" (Gaytan) were present for or involved in any way in the crime. In addition to falsely implicating these innocent men—instead of her boyfriend Vidal and her friend Velasquez—Gallegos also falsely minimized her own role in the shooting. Gallegos claimed she had merely been giving "Angel" and "Goofy" a ride home the night of the shooting and otherwise had no connection to it.

54.     At this point in the investigation, any reasonable officer would have realized that Gallegos's statements implicating Saldaña ("Angel") and Gaytan ("Goofy") were completely unreliable—given both Defendants' threats, coercion, and outright feeding of information and Gallegos's own self-interest to minimize her involvement and cover for her boyfriend, Vidal. Other than the fabricated statement Defendants coerced from Gallegos, no evidence ever implicated Gaytan in the shooting. And the only other evidence to implicate Saldaña would be fabricated by Defendant Donovan.

**Defendant Donovan uses improper suggestion—now with the teenage victims—to fabricate additional evidence against the innocent Saldaña.**

55.    On December 26 and 27, 1989, Defendant Donovan conducted photo identification procedures with the teen victims of the shooting.

56.    Donovan subsequently reported that during unwitnessed, unrecorded identification procedures, two of the teens (Manuel Urquidez and Angel Hernandez) positively identified Vidal and two others (Esteban Rodriguez and Angel Ontiveros) positively identified Saldaña. Donovan reported each of these identifications was made from proper, six-photo arrays, without any suggestion.

57.    Donovan's reports of the purported identifications of Saldaña were fabricated. None of the teens had seen Saldaña at the scene—because he was innocent, he was not there. Nor did Saldaña's face resemble the faces of the true perpetrators Vidal and Velasquez. They did not and would not have identified the innocent Saldaña—whom Donovan already suspected—without suggestion.

58.    Donovan falsely reported the circumstances of the identification procedures and their results. Donovan used improper suggestion—including directly pointing out his suspects in the photos—to get the teens to identify these suspects. Donovan then falsely claimed in his written reports and to the prosecutor that any identifications were made spontaneously, positively, and without any

COMPLAINT AND JURY DEMAND
16

suggestion. Tellingly, Donovan never asked the teens to sign any photo identification form to confirm the supposed positive identifications.

59.    Indeed, contrary to Donovan's report that driver Rodriguez immediately and positively identified Saldaña as the first person who had gotten out of the Datsun, Rodriguez actually did not identify Saldaña at all. Rather, at both the preliminary hearing and at trial Rodriguez correctly identified *Vidal* as the first person to leave the Datsun, who had challenged them about where they were from.

60.    Similarly, while Donovan reported that Ontiveros immediately and positively identified Saldaña as the first person who had gotten out of the Datsun, Ontiveros never made any positive identification because, as he made clear to Donovan, he was not sure. Donovan hid the true, exculpatory circumstances of this identification procedure.

61.    Donovan later reported that both Rodriguez and Ontiveros had actually identified Saldaña as the *second* person to leave the Datsun, i.e. the second shooter (now known to be Velasquez). This was another fabrication. Neither Rodriguez nor Ontiveros ever saw the second perpetrator (now known to be Velasquez, who had only stepped out of the Datsun and began shooting as the Monte Carlo was driving away) well enough to identify him.

**Saldaña is arrested based on fabricated evidence.**

62.    Saldaña, Vidal, and Gallegos were arrested based on arrest warrants prepared by Donovan. The sole basis for Saldaña's arrest was fabricated and wholly unreliable: Donovan's fabricated reports of the two purported photo identifications of Saldaña and the fabricated and obviously unreliable statement from Gallegos, which had been obtained as a result of Donovan and Maughan's threats and coercion.

63.    On January 3, 1989, Vidal and Gallegos were arrested together in Vidal's home. On the same date, Saldaña was arrested separately while at home on his family's property.

64.    On the evening of the arrests, detectives searched both Vidal's and Saldaña's homes, yet they found no incriminating evidence linking Saldaña to the shooting, because there was none. Unlike Vidal and Gallegos, Saldaña was innocent and was never involved.

**Saldaña is falsely identified at the preliminary hearing as a result of**

**Defendant Donovan's improper suggestion.**

65.    The prosecution's case against Saldaña was weak and based on evidence Defendants had fabricated. Although Donovan had falsely reported that two of the teenage victims—Rodriguez and Ontiveros—had identified Saldaña

without any suggestion, only one of the victims—Ontiveros—identified Saldaña at the January 1990 preliminary hearing.

66.    While on the stand at the preliminary hearing, Rodriguez did not identify Saldaña. Rodriguez identified Vidal as the first man out of the car who said "where you from" and "pull out the cuete." Although Donovan had falsely reported to the prosecution Rodriguez had identified Saldaña as the second man out of the car, Rodriguez truthfully testified he did not see the second man out of the car and could not identify that person.

67.    While Donovan's suggestion from the photo identification procedures he conducted had proved unsuccessful in securing false testimony from Rodriguez, his improper tactics worked with Ontiveros to a certain extent. Ontiveros provided the only preliminary-hearing evidence implicating Saldaña, but his testimony was weak and uncertain. Although he identified Saldaña as the second man out of the car, Ontiveros stated he only saw that person for about two seconds and the nearest streetlight was at least 25 feet away.

68.    As a result, Ontiveros's tentative and uncertain identification of Saldaña was flimsy and his description of who he saw as the second person out the car was vague; Ontiveros admitted that he couldn't tell how tall the second guy out of the car was, whether he had facial hair, nor what he was wearing. Ontiveros also

testified that he was "pretty shaky" and "[wasn't] too sure" whether the photos of Saldaña that Donovan had shown him were indeed the second guy out of the car.

69.    No other victims testified at the preliminary hearing, nor was any other evidence against Saldaña presented.

**Saldaña is wrongfully convicted based on fabricated evidence.**

70.    Saldaña's criminal trial took place in July 1990 in the Los Angeles County Superior Court. Saldaña was tried alongside two of the true perpetrators, Vidal and Gallegos.

71.    At the criminal trial, although there was significant evidence presented implicating Gallegos and Vidal in the crime, the evidence implicating Saldaña was extremely weak.

72.    No physical nor forensic evidence linked Saldaña to the crime.

73.    Moreover, no witnesses identified Saldaña at trial. Rather, Ontiveros's weak and fabricated preliminary-hearing identification was the only evidence presented connecting Saldaña to the shooting, which became even weaker when Ontiveros testified again as to the incident.

74.    At the trial, Ontiveros testified that he could not identify Saldaña as the second person out of the car or otherwise identify Saldaña as being involved in the shooting. Ontiveros testified merely that Saldaña was someone who "looked

like" the second guy out of the car but not that Saldaña was in fact the second guy out of the car.

75.  For his part, Rodriguez testified at trial that he only saw two people in the car: the driver, who he identified as Gallegos, and the front passenger, who he identified as Vidal. Rodriguez did not identify Saldaña as being involved in the shooting.

76.  Without any in-court identification of Saldaña at the criminal trial, the prosecutors had to rely solely on Ontiveros's preliminary-hearing testimony tentatively identifying Saldaña as being in the Datsun with Vidal and Gallegos on the night of the shooting—testimony that resulted from Defendant Donovan's impermissible suggestion.

77.  The criminal case against Saldaña, flimsy as it was, would have collapsed without the fabricated evidence Donovan had improperly obtained from Ontiveros.

78.  Indeed, had the prosecution and defense been made aware that Ontiveros's testimony was fabricated and the result of Donovan's misconduct, there would have been no case—no other occupants of the Monte Carlo identified Saldaña as being in the Datsun, and no other evidence presented at trial linked Saldaña to the crime.

79.    Saldaña's defense attorney argued for Saldaña's innocence, emphasizing in his closing: "My client is innocent…[Saldaña] wasn't there the night that this incident occurred, and he had nothing to do with [the crime.]"

80.    Nevertheless, Saldaña's defense was hampered by the Defendant officers' fabricated evidence, which was the only evidence that ever implicated him.

81.    On July 13, 1990, a jury wrongfully convicted Saldaña of attempted murder and other related charges. Vidal and Gallegos were convicted as well.

82.    At the conclusion of the trial in 1990, Saldaña's defense attorney continued to assert Saldaña's innocence by immediately filing a motion for a new trial based on the insufficiency of the evidence, but that motion was denied.

83.    On August 30, 1990, Saldaña was sentenced by the court to 45 years to life with the possibility of parole.

84.    In 1992, Saldaña's direct appeal was unsuccessful, and his sentence was affirmed.

**In 2017, the BPH and LADA Defendants withhold patently exculpatory evidence that kept Saldaña wrongfully imprisoned for six additional years until the evidence was disclosed.**

85.    On June 6, 2017, Saldaña first appeared before the BPH for a hearing on whether he was suitable for early release to parole. Defendant BPH Presiding

Commissioner Brian Roberts, along with another commissioner, presided over the parole hearing.

86.    At that parole hearing, Saldaña maintained his innocence under oath, testifying, "I'm sitting right here innocent 100% and I was charged and implicated in a crime[.]"

87.    The BPH gave Saldaña a five-year denial—in part due to his claims of innocence that, in the eyes of the BPH, meant he was not yet suitably rehabilitated.

88.    Just two months later, on August 31, 2017, Saldaña's co-defendant and one of the true perpetrators, Raul Vidal, appeared before the same BPH, this one led again by Defendant Roberts and Defendant Deputy Commissioner Stanton. The hearing was also attended by Defendant Los Angeles County Assistant District Attorney Steven Sowders, as well as a parole defense attorney for Raul Vidal.

89.    At that hearing, Vidal gave detailed testimony confessing to his own involvement in the 1989 shooting and proclaiming that Saldaña was not involved. When discussing the incident, Vidal testified under oath: "[Saldaña], he's actually innocent. It's, uh, Dino Velasquez who was with me." Vidal went on to testify to the circumstances of how he, April Gallegos, and Dino Velasquez were the true perpetrators of the shooting and the specific acts that they committed.

90.    Vidal made clear in his testimony that this parole hearing was his first time coming forward to admit that Dino Velasquez was his other co-conspirator in

the shooting, not Daniel Saldaña. When asked why he was coming forward now and also risking potential gang retaliation by openly identifying Velasquez, Vidal responded, "I'd rather tell the truth than continue to lie."

91.    Later on in the hearing, in an exchange between Defendants LADA Sowders and BPH Commissioner Roberts, the two officials confirmed this new, exculpatory evidence, with Sowders asking, "And did I hear correctly that he's saying the codefendant who was charged and convicted was not part of the life of the crime? Mr. Saldaña," to which Roberts responded, "[Vidal] made it clear to me that Mr. Dino Velasquez, I think it is… was the actual person who was with him[.]"

92.    At the end of the hearing, Defendant LADA Sowders argued that Vidal should not be released. In doing so, Sowders again recognized Vidal's admission that Velasquez was Vidal's other crime partner, not Saldaña, and Sowders referenced a need to reinvestigate the shooting based on this new testimony.

93.    At the end of the parole hearing, Defendants BPH Commissioner Roberts and Deputy Commissioner Stanton recommended that Vidal be granted early release over Sowders's objection, in part because Vidal demonstrated honesty and insight when he testified that his crime partner "was in fact not Saldaña but was [Velasquez]." Defendant Stanton expressed concern that Saldaña was in prison

for a crime he did not commit and "guarantee[d]" that the BPH was going to act on the information that Saldaña wasn't involved, emphasizing that "something needs to be done" about this new information.

94.    Each of Defendants Roberts, Stanton, and Sowders understood that Vidal's testimony regarding Saldaña's innocence was highly exculpatory to Saldaña. Defendants also understood Saldaña was still incarcerated in prison for the crime Vidal had testified Saldaña did not commit. Defendants also recognized Vidal's testimony was critical evidence Saldaña could use to prove his innocence and obtain his release from prison. Defendants had a duty to ensure that information was disclosed to Saldaña or Saldaña's counsel and understood that obligation.

95.    Indeed, Defendants' statements at the parole hearing demonstrated this understanding. Defendant Roberts openly expressed concern on the record that Saldaña may be "truly innocent" and "in prison for something he didn't do." Defendant Roberts went on to ask Vidal if he would be willing to testify in a court hearing to Saldaña's innocence—to which Vidal responded he would. Similarly, Defendant Stanton stated at the hearing that he was concerned that "there may be a guy in prison who didn't do . . . what he was said to have done" and stated "we'll be doing something with that, I guarantee you." In Defendant LADA Sowders's presence, Defendant Stanton also recognized Sowders had an independent

obligation to disclose the information: "I know the DA heard [that Saldaña wasn't involved in the shooting], so I'm assuming he's gonna make notes and send that back up the chain over there to find out what they want to do about that."

96.    After the 2017 hearing, on information and belief, John and Jane Doe employees of the CDCR's BPH and the LADA were made aware of Vidal's admissions of Saldaña's innocence. These employees similarly had a duty to disclose the exculpatory information proving Saldaña's innocence to Saldaña or Saldaña's counsel.

97.    Yet, for more than six years, neither the CDCR's BPH nor the LADA did anything about this new, exculpatory evidence. Despite hearing and affirmatively acknowledging the significance of the new, exculpatory evidence of Saldaña's actual innocence, and vowing to take action, Defendants Roberts, Stanton, Sowders, and John and Jane Does, failed to disclose this new, exculpatory evidence to Saldaña, Saldaña's counsel, or the court, as required by law.

**In 2022, Saldaña is denied early release to parole again, despite the BPH being in possession of undisclosed evidence of his innocence.**

98.    Saldaña appeared before the CDCR's BPH again on June 30, 2022. This time no representative from the LADA was present, despite by law being notified of the hearing. Saldaña was represented by counsel at the hearing.

99.    Before and during the hearing, Defendants Roberts, Stanton, Sowders, and John and Jane Does never disclosed Vidal's testimony of Saldaña's innocence to Saldaña or his counsel. It was not placed in Saldaña's central file, nor was it raised during the parole hearing. Nonetheless, Saldaña continued to maintain his innocence, and he was again denied early release to parole.

100.    It was not until around February 2023 that the current LADA CIU was alerted to the exculpatory evidence that Vidal had testified Saldaña was innocent. The exculpatory evidence was significant and material—it led to a complete reinvestigation of Saldaña's conviction, which fully corroborated Vidal's testimony that Saldaña was in fact innocent. Within four months of the CIU receiving the exculpatory evidence, Saldaña was found factually innocent and freed from prison.

## DAMAGES

101.    Daniel Saldaña was wrongfully incarcerated in California jails and prisons from January 3, 1990, to May 11, 2023—losing over 33 years of his life—for a crime that he did not commit.

102.    As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, or deliberately indifferent acts and omissions, Saldaña sustained injuries and damages, which continue to date and will continue into the future, including: loss of freedom and liberty for over 33 years; physical pain and

suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income and career opportunities; humiliation, indignities, and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

103.  Additionally, the emotional pain and suffering caused by losing those more than 33 years has been substantial. During his incarceration, Saldaña was completely stripped of the various pleasures of the basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right.

## CLAIMS

### Count I: 42 U.S.C. § 1983 Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial

*Against Defendants Donovan and Maughan*

104.  Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

105.  Defendants Donovan and Maughan fabricated false evidence of Saldaña's guilt, thereby violating his right to a fair trial and causing him to be

deprived of his liberty without due process of law. Defendants caused this false evidence to be used against Saldaña in his prosecution and at trial.

106.  The false evidence asserted herein is comprised of affirmatively false and misleading statements, including in police reports, prepared or given in connection with the investigation of the shooting and attempted murder of the six teenagers on October 27, 1989, in a neighborhood of Baldwin Park, California.

107.  Defendants also obtained false and fabricated eyewitness identifications through suggestion, coercion, or other improper means.

108.  Defendants' misconduct did not cease with Saldaña's wrongful conviction but continued to his exoneration, thereby prolonging his wrongful incarceration.

109.  Defendants also deprived Saldaña of his right to a fair trial by withholding material exculpatory and impeachment evidence from prosecutors and the defense in violation of the Constitution and *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

110.  The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, or involved callous indifference to Saldaña's federally protected constitutional rights. These acts were perpetrated while Defendants were acting in their capacities as employees or agents of the City of Baldwin Park or Los Angeles County and under color of state

law. No reasonable officer would have believed this conduct was lawful in 1989
through 1990.

111.  As a direct and proximate result of Defendants' actions, Saldaña was
wrongly arrested, detained, and charged with murder; prosecuted, convicted, and
sentenced to 45 years to life in prison; and then incarcerated for more than 33
years; and suffered the other grievous injuries and damages set forth above.

## Count II: 42 U.S.C. § 1983 Malicious Prosecution in Violation of
## the Fourth and Fourteenth Amendments

### *Against Defendants Donovan and Maughan*

112.  Plaintiff realleges all the foregoing and any subsequent paragraphs
contained in the complaint, as if fully set forth herein.

113.  Defendants caused criminal proceedings to be brought against Saldaña
without probable cause and without any reasonable belief in guilt. Saldaña is
completely innocent of the shooting in October 1989 in Baldwin Park, California.

114.  Defendants caused the baseless criminal proceedings to continue
against Saldaña in violation of his constitutional rights.

115.  No reasonable officer in 1989 through 1990 would have believed that
fabricated evidence provided probable cause to arrest, and no reasonable officer in
1989 through 1990 would have believed that an arrest without probable cause was
justified.

116.  Defendants continued the prosecution against Saldaña on the basis of false and fabricated inculpatory evidence and the suppression of material exculpatory evidence, thereby subjected him to an ongoing seizure in violation of the Fourth and Fourteenth Amendments.

117.  The criminal proceedings against Saldaña were initiated with malice. Defendants caused the charges against him to be filed—and caused them to be continued—by knowingly providing the prosecution misinformation, concealing exculpatory evidence, and otherwise engaging in wrongful and bad faith conduct that caused the initiation of the legal proceedings against Saldaña when they knew there was no probable cause.

118.  Defendants initiated the action against Saldaña for the purpose of denying his constitutional rights, including his right to be free from unreasonable searches and seizures and his right not to be deprived of liberty without due process of law.

119.  As a direct and proximate result of Defendants' actions, Saldaña was wrongly arrested, detained, and charged with murder; prosecuted, convicted, and sentenced to 45 years to life in prison; incarcerated for more than 33 years; and suffered the other grievous injuries and damages set forth above.

120.  The criminal proceedings against Saldaña terminated in his favor. On May 11, 2023, the Los Angeles County Superior Court entered an order finding

Saldaña factually innocent of all charges against him, vacating the conviction, and ordering Saldaña to be released from custody. All charges against Saldaña were dismissed.

## Count III: 42 U.S.C. § 1983 Civil Rights Conspiracy

*Against Defendants Donovan and Maughan*

121. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

122. Defendants Donovan and Maughan agreed among themselves, and with others, to act in concert to deprive Saldaña of his clearly established constitutional rights as protected by the Fourth and Fourteenth Amendments, including his right not to be deprived of liberty without due process of law and to be free from illegal seizure.

123. As described in detail above, in furtherance of the conspiracy, Defendant Donovan, Defendant Maughan, and others, engaged in and facilitated numerous overt acts in furtherance of the conspiracy.

124. No reasonable officer in 1989 through 1990 would have believed this conduct was lawful. As a direct and proximate result of Defendants' actions Saldaña was wrongly arrested, detained, and charged with murder; prosecuted, convicted, and sentenced to 45 years to life in prison; incarcerated for more than 33 years; and suffered the other grievous injuries and damages set forth above.

## Count IV: 42 U.S.C. § 1983 Failure to Intervene

*Against Defendants Donovan and Maughan*

125.  Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

126.  By their conduct and under color of state law, Defendants, acting within the scope of their employment, had opportunities to intervene on behalf of Saldaña to prevent his malicious prosecution and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so. No reasonable officer in 1989 through 1990 would have believed this conduct was lawful.

127.  These Defendants' failures to intervene violated Saldaña's clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable officer or investigator in 1989 through 1990 would have believed that failing to intervene to prevent Defendants from fabricating inculpatory evidence, concealing and withholding exculpatory evidence, or causing Saldaña to be arrested and prosecuted without probable cause, were lawful.

128.  These Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Saldaña's injuries. Defendants knew, or should have known, that their conduct would result in Saldaña's wrongful arrest, prosecution, conviction, and incarceration.

129.  As a direct and proximate result of Defendants' failure to intervene, Saldaña was wrongly arrested, detained, and charged with murder; prosecuted, convicted, and sentenced to 45 years to life; incarcerated for more than 33 years, and suffered the other grievous injuries and damages set forth above.

## Count V: 42 U.S.C. § 1983 Deprivation of Liberty

## Without Due Process of Law

*Against Defendants Roberts, Stanton, Sowders, and John and Jane Does*

130.  Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

131.  From 2017 to 2023, Defendants, with deliberate indifference and/or reckless disregard, withheld, failed to disclose, and/or failed to take sufficient steps to act on highly exculpatory evidence of Saldaña's innocence obtained during Raul Vidal's parole hearing, at which Defendants Roberts, Stanton, and Sowders were present.

132.  Saldaña had a liberty interest in proving his innocence, including through new exculpatory evidence.

133.  Defendants were aware of their responsibility and obligations to disclose the highly exculpatory evidence. At the parole hearing, Defendants Roberts and Stanton expressly recognized the gravity of the new evidence demonstrating Saldaña's innocence and were concerned that Saldaña was in prison

for something he did not do. Defendant Sowders similarly understood that Vidal's testimony was patently exculpatory. Defendants represented that the BPH and LADA were going to act immediately on the exculpatory evidence. Instead, out of deliberate indifference and/or reckless disregard, Defendants, including John and Jane Does, did nothing, leaving Saldaña wrongfully imprisoned for another six years until the evidence was disclosed.

134.  Defendants' misconduct deprived Saldaña of powerful new evidence of innocence that he did not receive until its belated disclosure in 2023. Had the critical exculpatory information been disclosed, Saldaña would have been exonerated and freed from prison years earlier. Indeed, within four months of the disclosure of the exculpatory evidence, Saldaña was found factually innocent.

135.  Defendants' misconduct deprived Saldaña of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

136.  The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, or involved callous indifference to Saldaña's federally protected constitutional rights. These acts were perpetrated while Defendants were acting in their capacities as employees or agents of Los Angeles County and/or the State of California and under color of state law. No reasonable officer would have believed this conduct was lawful in

2017 through 2023. As a direct result of Defendants' misconduct, Saldaña's incarceration was wrongfully extended, and he suffered grievous injuries and damages set forth above.

## Count VI: Intentional Infliction of Emotional Distress

*Against Defendants Roberts, Stanton, Sowders, and John and Jane Does*

137.   Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

138.   Defendants, acting with intention to cause or with reckless disregard of the probability of causing emotional distress, engaged in extreme and outrageous conduct by failing to disclose and/or take sufficient steps to act on material exculpatory evidence which would have—and ultimately did—prove Saldaña's innocence.

139.   Knowing that Saldaña was innocent and in prison for a crime he did not commit, Defendants intentionally withheld the exculpatory evidence to cause Saldaña severe emotional distress.

140.   As a direct and proximate cause of Defendants' failure to disclose the exculpatory evidence, Saldaña's incarceration was extended, and he suffered severe emotional suffering and serious mental distress.

## Count VII: Intentional interference with right to obtain judicial review of legality of confinement in violation of Cal. Gov't Code § 845.4

*Against Defendants Roberts, Stanton, Sowders, John and Jane Does,*

*and Los Angeles County*

141.  Plaintiff alleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

142.  In 2017, Defendants learned of exculpatory evidence about Saldaña's innocence and failed to disclose it and/or take sufficient steps to act on it for the next six years, including before Saldaña's parole hearing in 2022.

143.  Between 2017 and 2023, Defendants intentionally and unjustifiably interfered with Saldaña's right to obtain a judicial determination or review of the legality of his confinement. At all relevant times, individual Defendants were employees of the BPH or Los Angeles County and were acting within the scope of their employment.

144.  On May 11, 2023, the Los Angeles County Superior Court of California vacated Saldaña's conviction, found Saldaña actually innocent, and ordered him to be released that same day.

145.  As a direct and proximate result of Defendants' intentional and unjustifiable interference with the judicial determination of Saldaña's confinement, Saldaña suffered serious harm and damages.

## Count VIII: Negligence in violation of Cal. Civ. Code § 1714

*Against Defendants Roberts, Stanton, Sowders, and John and Jane Does*

146.  Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

147.  Defendants acted negligently when they failed to disclose and/or take sufficient steps to act on the highly exculpatory evidence of Saldaña's innocence, resulting in the extension of Saldaña's wrongful incarceration.

148.  Defendants owed Saldaña a duty to act with reasonable and due care. Defendants breached their duty of reasonable and due care to Saldaña by failing to disclose the exculpatory evidence of Saldaña's innocence.

149.  Defendants' negligence was a substantial factor in causing Saldaña's harm. As a direct and proximate result of Defendants' conduct, Saldaña suffered serious harm and damages.

## Count IX: Suppression of Exculpatory Evidence in violation of Cal. Gov't Code § 815.6

*Against Los Angeles County*

150.  Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

151.  Under California Government Code § 815.6, a public entity is directly liable where it is under a mandatory duty imposed by an enactment that is designed

to protect against the risk of a particular kind of injury and it fails to discharge that duty with reasonable diligence.

152.  Defendant Los Angeles County had ongoing legal, constitutional, and statutory duties that obligated it to disclose evidence that was highly exculpatory and demonstrated that Saldaña was wrongly imprisoned. Defendant was obligated to disclose exculpatory evidence to protect against the litany of injuries that stem from a wrongful incarceration.

153.  By taking no or insufficient actions in the face of such highly exculpatory evidence showing Saldaña's innocence, Los Angeles County breached and failed to discharge its duty of disclosure with reasonable diligence.

154.  As a direct and proximate cause of Defendant's failure to disclose or take sufficient steps to act on the exculpatory evidence, Saldaña suffered serious harm and injury.

**Count X: Respondeat Superior or Vicarious Liability under Cal. Gov't Code § 815.2**

*Against Los Angeles County*

155.  Plaintiff alleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

156.  California law provides that public entities are liable for injuries proximately caused by an act or omission of an employee of the public entity acting within the scope of his employment.

157.  Saldaña suffered injuries as a proximate result of the misconduct of Defendant Sowders and Defendant LADA John and Jane Does, who, at all relevant times, were employees of Los Angeles County and acting within the scope of their employment.

158.  Between 2017 and 2023, Defendants Sowders and LADA John and Jane Does withheld or failed to disclose highly exculpatory evidence of Saldaña's innocence. Had it not been for Defendants' failure to turn over the exculpatory evidence, Saldaña's incarceration would not have been prolonged by six years, beginning in 2017.

159.  Individual Defendants' tortious conduct was undertaken when carrying out typical activities within their employment. Their conduct was reasonably expected and foreseen by Los Angeles County.

## JURY DEMAND

160.  Pursuant to the Seventh Amendment of the United States Constitution, Saldaña requests a jury trial on all issues and claims set forth in this Complaint.

# **PRAYER FOR RELIEF**

WHEREFORE, Daniel Saldaña demands judgment jointly and severally against Defendants as follows:

A. That the Court award compensatory damages to him and against the Defendants, jointly and severally, in an amount to be determined at trial but that exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction over this action;

B. That the Court award punitive damages to him, and against all individual Defendants, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

C. For a trial by jury;

D. For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E. For any and all other relief to which he may be entitled.


Dated: February 1, 2024               /s/ Amelia Green
                                      NICK BRUSTIN
                                      AMELIA GREEN
                                      RHIANNA REY
                                      ANNIE SLOAN
                                      **Neufeld, Scheck, Brustin, Hoffmann, & Freudenberger LLP**

COMPLAINT AND JURY DEMAND

/s/ Michael Romano
MICHAEL ROMANO
SUSAN CHAMPION
**Stanford Law School**
**Three Strikes Project**

/s/ Michael G. Freedman
MICHAEL G. FREEDMAN
ASHWINI MATE
**The Freedman Firm PC**

*Attorneys for Plaintiff Daniel Saldaña*